**ENSCO ENVIRONMENTAL SERVICES, INC., Plaintiff,**

v.

**UNITED STATES of America; United States of America, Department of the Army; John O. Marsh, Jr., Secretary of the Army; and Colonel Robert M. Amrine, Defendants.**

No. 86–1264–CV–W–3.

United States District Court,
W.D. Missouri, W.D.

Dec. 18, 1986.

Carl Helmstetter, Mark Thornhill, Spencer, Fane, Britt & Browne, Kansas City, Mo., for plaintiff.

Carlton M. Henson II, Gregg E. Bundschuh, Peterson, Young, Self & Asselin, Atlanta, Ga., for defendants.

## MEMORANDUM AND ORDER

ELMO B. HUNTER, Senior District Judge.

The controversy in this case centers around an Army Corps of Engineers' contract to clean up a hazardous waste site in New Jersey. Plaintiff Ensco Environmental Services, Inc. ("EES Inc.") was low bidder on the contract, but was not awarded the contract. The Corps of Engineers felt that its bid was unresponsive to the bid specifications because its bid guarantee was invalid. EES Inc. then filed this action seeking an injunction preventing the Corps of Engineers from allowing the second lowest bidder to proceed and a declaration that EES Inc. is to be awarded the contract. On December 1, 1986, a hearing was held to determine whether Plaintiff was entitled to preliminary relief. At the hearing, counsel on both sides indicated a willingness to go forward on the merits in the near future. Given the urgency in beginning the clean up of the hazardous waste at the project site and since very few important facts seemed to be in dispute, the Court agreed to hold a full trial on the merits during the following week if the parties would attempt to stipulate to as many facts as possible. The parties agreed to do so. The trial was held on December 9, 1986.

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. Likewise, venue is proper in the Western District of Missouri under 28 U.S.C. § 1391(e).

## BACKGROUND

The Army Corps of Engineers, Kansas City District, issued invitation for bid No. DACW41–86–B–0121 on April 22, 1986. The invitation sought bids from companies interested in working on a project described as "The Tank Farm Demolition, Bridgeport Rental Oil Services Site, Logan Township, New Jersey." ("Tank Farm Project"). The Bridgeport Rental Oil Services site consists of over 90 tanks and process vessels, drums and trucks and a twelve acre waste oil and waste water lagoon. The lagoon and many of the tanks contain significant quantities of polychlorinated biphenyls ("PCBs") and a number of other hazardous substances. The site is listed as number 35 on a list of 703 hazardous waste sites prioritized for cleanup under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq. See* 40 C.F.R. § 300 app. B (1986). The work to be done on the Tank Farm Project includes, *inter alia,* the removal and demolition of all tanks and other structures on the site and the removal of hazardous wastes stored on the site. The Corps of Engineers became involved in the project under an interagency agreement between the EPA and the Corps.

Sealed offers to bid on the project were to be delivered to the Army Corps of Engineers office in Kansas City, Missouri, by 3:00 p.m. Local Time on September 10, 1986. Each bid was to be accompanied by a bid guarantee. The bid solicitation provisions provided that failure to furnish "a bid guarantee in the proper form and amount, by the time set for opening of bids, may be cause for rejection of the bid." [1] Tank Farm Project solicitation Provisions at SP–8. EES Inc. and three other companies submitted bids for the project. When the bids were opened on September 10, 1986, it was announced that EES Inc. had submitted the apparent low bid.

At the bid opening, all bids were given a cursory examination by the Bid Opening Officer, Mr. Ralph E. Yaple, and by an Assistant District Counsel for the Corps, Mr. Mark Collins. They found that EES Inc. had submitted an irrevocable letter of credit as its bid guarantee. Both Mr. Yaple and Mr. Collins considered this to be a somewhat unusual form for a bid guarantee since bidders generally used bid bonds, rather than letters of credit as guarantees. Because of this, Mr. Collins later examined the letter of credit in more detail. He found that the applicant of the letter of credit was a company named Environmental Systems Company of Little Rock, Arkansas ("ESC"), not EES Inc. The bid listed EES Inc. as a New York Corporation [2] located in North Tonawenda, New York. ENSCO, Inc. ("ENSCO") of Little Rock, Arkansas, was listed as EES Inc.'s parent corporation in the bid document. Thus, ESC, the applicant on the letter of credit was a third company, not otherwise referred to in the bid documents submitted by EES Inc.[3]

---

**1.** The solication provision further provides:
The offerer (bidder) shall furnish a bid guarantee in the form of a firm commitment, such as a bid bond, postal money order, certified check, cashier's check, irrevocable letter of credit, or, under Treasury Department regulations, certain bonds or notes of the United States ...
Tank Farm Project Solication Provisions at SP–8. The guarantee ensures that the government is protected in the event the successful bidder fails to execute the necessary contractual documents or fails to give the bond(s) required for the project within the specified time. If either

occurs and the successful bidder is held in default, the bidder is liable for the excess cost to the government of having someone else do the work.

**2.** Mr. Frederic Schwartz, Vice President of Marketing at EES Inc. tesitifed at trial that this was a mistake. He said that EES Inc. is an Arkansas Corporation that is registered to do business in New York.

**3.** However, the letter of credit listed ESC's address as 1015 Louisiana, Little Rock, Arkansas. The bid documents listed this as ENSCO's address.

On September 15, 1986, Mr. Yaple called the office of EES Inc. in New York to find out the relationship, if any, between EES Inc. and ESC. He testified that he attempted to talk to Mr. Frederic M. Schwartz, the person who had signed the bid solicitation for EES Inc. However, Mr. Yaple did not reach Mr. Schwartz and instead talked with another person whose name he could not recall.[4] Mr. Yaple testified that the person he talked with confirmed that EES Inc. was a New York corporation and that ENSCO of Little Rock was the Parent company of EES Inc. He further testified that the person told him that ESC and ENSCO were one and the same company.

On September 15, 1986, Mr. Collins contacted MBank Dallas ("MBank"), the Bank that issued the letter of credit, in order to determine if the applicant on the letter of credit (ESC) and the bidder (EES Inc.) were the same legal entity. He spoke with a Mr. Regan Stewart who informed him that he should contact a Mr. Jim Dawson. The next day, Mr. Collins spoke with Mr. Dawson who informed him that ESC was his customer and that the letter of credit was issued at ESC's request.[5] Mr. Dawson also told him that ESC was a Delaware corporation headquartered in Little Rock, Arkansas. Mr. Collins further testified that Mr. Dawson told him that he did not know of and was not familiar with a company called ENSCO Environmental Services, Inc. of New York.

On September 18, 1986, Mr. Collins issued a legal opinion recommending that EES Inc.'s bid be rejected as nonresponsive because the applicant on the letter (ESC) of credit was not the same entity as the bidder (EES Inc.). In essence, his opinion stated that when the applicant and bidder are different entities, the bid guarantee would not be effective as against the applicant should the bidder default. He cited several decisions of the Comptroller General of the United States which supported this position. *In re S & S Constructing*, Comp.Gen. No. B–214927, 84–1 CPD ¶ 670 (1984); *In re Future Electric Co.*, Comp. Gen. No. B–212938, 84–1 CPD ¶ 216 (1984); *In re A.D. Roe Co., Inc.*, Comp.Gen. No. B–181692, 74–2 CPD ¶ 194 (1974).

On September 19, 1986, the Corps received an organizational chart from the bidder. The chart showed that ENSCO, Inc. was the parent company of EES Inc. and ESC was the parent company of ESC.[6] It is unclear whether Mr. Collins had access to this information prior to issuing his legal opinion. However, the legal opinion makes clear that his recommendation would be the same whether the applicant and bidder were parent-subsidiary corporations or entirely independent entities.

On or around September 23, 1986, the Contracting Officer, Colonal Amrine, signed an internal document entitled "Determination and Findings"[7] which stated that he had determined that EES Inc.'s bid was nonresponsive because the letter of credit "was not made in favor of the principal which submitted the bid." Thereafter, on September 30, 1986, the Tank Farm contract was awarded to Rollins Environmental Services, F.S., Inc., the second lower bidder.

---

**4.** Plaintiff objected to Mr. Schwartz's testimony regarding the phone call to EES Inc. on hearsay grounds. The Court sustained the objection, but let the testimony in for the limited purpose of showing the state of mind of Col. Robert M. Amrine, the Contracting Officer, when he determined that the letter of credit was not a valid bid guarantee.

**5.** Again, the telephone conversation between Mr. Collins and Mr. Dawson was allowed into evidence only to show Colonel Amrine's state of mind in rejecting EES Inc.'s bid guarantee. *See supra*, note 4.

**6.** This information was sent to show that Mr. Schwartz, who signed the bid for the Plaintiff, had authority to legally bind the Plaintiff. Apparently, there was some question of this on the face of the bid documents.

**7.** The document was not dated, but Mr. Yaple who prepared the document for Col. Amrine's signature stated that to the best of his knowledge the Colonel signed it on September 23, 1986.

EES Inc. telephoned the Corps on October 1, 1986, to inquire about the status of the contract and was informed that Rollins had been awarded the contract.[8] On October 2, 1986, EES Inc. filed a formal protest of the Corps' decision with the General Accounting Office (GAO) asking the GAO to either waive the error or to allow it to submit a corrected letter of credit.[9]

The Comptroller General issued a decision on October 9, 1986, which dismissed the Plaintiff's protest as being without merit. *In re ENSCO Environmental Services, Inc.,* Comp.Gen. No. B–224266 (Oct. 9, 1986). The decision stated that a bid guarantee which names a principal different from the bidder is materially deficient and cannot be waived as a minor error or corrected after opening. *Id.* Plaintiff then filed a request for reconsideration with the GAO. On October 24, 1986, the Comptroller General denied the Planitiff's request for reconsideration of its earlier decision. The Comptroller noted that the letter of credit indicated that MBank Dallas agreed to be bond "only on behalf of [EES Inc.'s] parent company." *In re ENSCO Environmental Services, Inc.,* Comp.Gen. No. B–224266.2 (Oct. 24, 1986). Relying on suretyship principles, the decision stated: "it is doubtful whether the Corps could enforce the letter of credit if [EES Inc.] failed to carry out its obligations [and] as a result, the letter of credit is deficient." *Id.* Thereafter, on November 26, 1986, Plaintiff filed the instant action.

## STANDARD OF REVIEW

■ It should first be noted that the Court is reviewing the actions of the Contracting Officer, not those of the Comptroller General. This is because the officer's action is considered the "final action" within the meaning of the Administrative Procedure Act. 5 U.S.C. § 500. *See Simpson Electrical Co. v. Seamans,* 317 F.Supp. 684, 686 (D.D.C.1970).

■ The parties seem to be in agreement, and the Court concurs, that the Contracting Officer's decision should not be overturned unless it was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir. 1971). This is a narrow standard of review; "agency action is arbitrary and capricious only where it is not supportable on any rational basis." *Brotherhood of Ry. & Airline Clerks v. Burlington Northern, Inc.,* 722 F.2d 380, 381 (8th Cir.1983). Under this standard the Court may not substitute its own judgment as that of the agency. *Id.*

## ANALYSIS

### I

■ The preliminary issue is whether the letter of credit issued by MBank was legally valid so as to bind the bank to pay the Corps of Engineers in the event that EES Inc. defaulted.

As mentioned, the Corps of Engineers relied on suretyship principles in finding the letter of credit invalid; the Defendants base their argument herein on the same rationale. They argue that MBank was only obliged to pay on the letter of credit if the applicant, *ESC,* defaulted on the beneficiary, the Corps of Engineers. And, since *EES Inc.* was the bidder, the bank would not have to pay if EES Inc. defaulted. Therefore, they argue the letter of credit is not a valid bid guarantee. This is the rationale used by the Comptroller General in *In re S & S Contracting, supra,* which held that a letter of credit was an invalid bid guarantee if the applicant was not the bidder. *In re S & S Contracting,* adopted its analysis from Comptroller decisions which hold that a bid bond that names a principal different from the bidder is not a valid bid guarantee. *See In re A.D. Roe*

---

8. EES Inc. received a letter dated October 3, 1986, formally notifying it that its bid had been rejected.

9. An amendment to the letter of credit, changing the applicant's name to EES Inc., was received by the Corps on October 3, 1986.

Co., Inc., 54 Comp.Gen. 271, 74–2 CPD ¶ 194 (1974); *In re Future Electric Co.*, B–212938, 84–1 CPD ¶ 216 (1984).

■ The Defendant's (and Comptroller General's) reliance on bid bond cases to analyze the enforceability of a letter of credit is misplaced. The legal operation of a letter of credit is distinct from that of a bid bond. A bid bond is a surety agreement. In a surety or guarantor situation, the surety is not primarily liable to the beneficiary. Its liability is governed by the liability of the principal on the underlying transaction. *Associacion de Azucareros de Guatemala v. United States National Bank*, 423 F.2d 638, 641 (9th Cir.1970). Thus, it is logical to hold that a bid bond is an insufficient guarantee when it has a principal different from the bidder. If the principal owes no liability to the beneficiary, then the surety does not either and the beneficiary is not protected by the bid bond.

■ However, a letter of credit, unlike a bid bond, is not a surety agreement. *See* J. White & R. Summers, Handbook of the law Under The Uniform Commercial Code, § 18–2 (1985). A letter of credit is "an engagement by a bank ... made at the request of a customer ... that the [bank] will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." U.C.C. § 5–103(1)(A). A letter of credit is independent of the underlying transaction. *See Bossier Bank & Trust v. Union Planters National Bank*, 550 F.2d 1077, 1081 (6th Cir.1977) Appendix A. (Memorandum Opinion Honorable Bailey Brown, Chief Judge W.D. Tenn.). The bank, upon issuance of the letter of credit, becomes primarily liable to the beneficiary of the credit. *Republic National Bank v. Northwest National Bank*, 578 S.W.2d 109, 114 (Tex. 1979). The beneficiary of the credit is entitled to payment upon compliance with the terms and conditions of the credit. *See East Girard Savings Association v. Citi-*

*zens National Bank & Trust Company*, 593 F.2d 598, 602 (5th Cir.1979). With narrow exceptions, the bank must honor the draft drawn on the letter unless the documents required to be presented are inconsistent on their face. U.C.C. § 5–109(2). The bank is not to make reference to the rights and obligations to the parties to the underlying contract in deciding whether to pay. *See Republic National Bank*, 578 S.W.2d at 114. From the above discussion, it is abundantly clear that the principles of suretyship are not pertinent to an analysis of the force and effect of a letter of credit.[10]

Unfortunately, because the credit in this action was somewhat unique, the case law on letters of credit does not provide an easy answer to the question of whether MBank was obligated to honor the letter if the Plaintiff breached its agreement with the Corps.

The typical letter of credit involves three parties (issuer, customer/applicant, and beneficiary) and three separate transactions: (1) the contract between the bank and its customer to issue a letter of credit; (2) the letter of credit in which the issuing bank agrees to pay the beneficiary when the conditions contained in the letter are complied with; and (3) the underlying contract between the customer and the beneficiary for which the letter of credit was obtained. *See Barclays Bank D.C.O. v. Mercantile National Bank*, 481 F.2d 1224, 1239 n. 21 (5th Cir.1973), *cert. dismissed*, 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974).

■ This case is unique because it involves 4 parties: ESC, (applicant/customer), MBank (issuing Bank), the Corps of Engineers (beneficiary), and EES Inc. (the entity that used the letter of credit as a bid guarantee.) No case was found by either the Court or the parties which addressed the question of whether such a credit is valid.[11] However, the Court is of the opin-

---

**10.** Given this, the Court rejects the Comptroller General's decision in *S & S Contracting, supra,* insofar as it applies surety principles to letters of credit.

**11.** It is not unusual for a bank to issue a letter

ion that a "four party" letter of credit is not *per se* invalid. Nothing in the U.C.C. precludes the validity of a credit simply because the applicant is not involved in the underlying contract or otherwise in privity with the beneficiary. In fact, the primary purpose for using a letter of credit is to make payment from the bank independent of the underlying contract. *See generally White & Summers, supra,* § 18–1.[12] As mentioned, this is accomplished by making the issuer of the credit primarily liable without regard to the underlying contract. *Republic Bank,* 578 S.W.2d at 114.

Since the four party nature of the credit does not preclude its enforceability, the next question is: Could the Corps have legally required MBank to honor the letter of credit?

■ A beneficiary of a letter of credit must strictly comply with its terms in order to receive payment under the credit *Consolidated Aluminum Corp. v. Bank of Virginia,* 704 F.2d 136, 168 (4th Cir.1983); *Insurance Co. of North America v. Heritage Bank,* 595 F.2d 171, 173 (3d Cir.1979). Without such strict compliance the bank is not required to pay. For example, if MBank's letter of credit had stated that it would only be paid if the applicant, ESC, breached its agreement with the Corps on the Tank Farm Project Bid, the government could not have received payment on the letter, because *ESC* did not bid on the project, *EES Inc.* did.

MBank's letter of credit provides in pertinent part: [13]

> of credit at the *request* of a "fourth party", with the bank looking to the "fourth party" for reimbursement if it pays a draft drawn on the letter. In such cases, however, the person who needs the credit for his dealings with the beneficiary is usually listed as the applicant on the letter of credit. *See, e.g., East Girard Savings Association v. Citizens National Bank & Trust Co.,* 593 F.2d 598 (5th Cir.1979).

**12.** Letters of credit were originally used to facilitate international transactions involving sales of merchandise by assuring payment for the goods. In a typical transaction, a seller in a distant country might wish to sell some goods to a buyer whose credit he did not trust. In order to ensure that the goods

We hereby issue our Clean Irrevocable Standby Letter of Credit in your favor available by your draft on us at sight bearing the clause "Drawn under MBank —Dallas, N.A. Letter of Credit No, 2596968–215 dated September 10, 1986," accompanied by this original Letter of Credit.

Special Instructions: Negotiations restricted to MBank—Dallas, N.A. PARTIAL DRAWINGS ARE NOT PERMITTED.

This Letter of Credit is for Fed. # DACW 41–86–B–0121.

On its face, it only requires that a draft, accompanied by the original letter of credit, be presented to MBank. "However, the terms "Clean", "Irrevocable" and "Standby" are terms of art which may imply additional conditions on payment.

■ In essence, "irrevocable" means that once a letter of credit is sent to the beneficiary it cannot be modified or revoked without the consent of both the applicant and the beneficiary. U.C.C. § 5–106(1) and (2). A "clean" letter of credit "is payable merely upon presentation of a draft with no accompanying documents." *Apex Oil Co. v. Archem Co.* 770 F.2d 1353, 1355 (5th Cir.1985). Clean letters of credit are distinguishable from "documentary" letters of credit which require presentation of a document of independent legal significance, such as a certificate of title or an invoice, in order to receive payment. *Id.*

> would be paid for, the seller could require the buyer to procure a letter of credit which would provide that upon presentation of certain documents—normally bills of lading or air freights receipts—evidencing title to the goods, the seller could draw on the letter of credit. The issuing bank would then take a security interest in the goods and deliver the title documents to the buyer, who would be obligated to repay the amount drawn on the letter of credit.
> *East Girard Savings Ass'n.* 593 F.2d at 601 (citations omitted).

**13.** The entire letter of credit is reprinted in full in the Appendix.

■ A "standby" letter of credit is one that is only to be called upon if there is a default in the underlying contract. *First Empire Bank v. Federal Deposit Insurance Corp.*, 572 F.2d 1361, 1367 (9th Cir.) *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); *Temtex Products, Inc. v. Capital Bank & Trust Co.*, 623 F.Supp. 816 (D.La.1985) *aff'd*, 788 F.2d 1563 (5th Cir.1986). "Therefore, a standby letter of credit will often be a documentary letter of credit since the issuer will require some kind of accompanying documentation to indicate or establish that there has been a default, making it liable to pay." *Apex Oil Co.*, 770 F.2d at 1356. A letter of credit not expressly labeled as such can be treated as a standby letter because of other conditions contained in the letter. *Id.*

MBank's letter states that it is a "clean letter" and on its face it requires no explicit proof of notice of any default on the underlying obligation. One could argue that by labeling it standby and referring to the bid by number, the letter required documentation of default. And, the Corps could not document that ESC had defaulted, since it was not a bidder. A Fifth Circuit case, *United States v. Sun Bank of Miami*, 609 F.2d 832 (5th Cir.1980), indicates otherwise.

In *Sun Bank*, the Bank issued a letter of credit which stated that the "funds are to be used and disbursed by [the beneficiary] as supplement funds to complete Camino Real Condominiums ..." *Id.* at 833. The beneficiary drew a draft on the letter of credit payable to the United States Department of Treasury to pay delinquent taxes. The bank refused to pay the draft because it felt that "payment would contravene the designated purpose of the letter of credit." *Id.* The Court stated: "Because the letter of credit in this case did not expressly require that the draft show the funds' intended use or that supporting documents accompany the letter of credit, the banks ought to have honored the otherwise unchallenged draft." *Id.* The Court emphasized that the letter clearly did not require any documentation showing that the funds were used for a specific purpose. The language in the credit which referred to the intended use of the funds, at best, created an ambiguity which had to be construed against the bank as drafter of the letter. *Id.*

MBank's letter clearly does not require any documentation that the applicant defaulted. The use of "standby" merely indicates that it is not expected to be used unless there is some sort of default. At best, the use of "standby" in conjunction with the reference to the Tank Farm bid number creates an ambiguity as to whether documentation of default on the project is needed. And, as mentioned in *Sun Bank*, any ambiguity is to be construed against the drafter, MBank. *Id; see also East Girard* 593 F.2d at 602; *Bossier Bank & Trust*, 550 F.2d at 1082; *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 466 (2d Cir.1970). Thus, the Court finds that the letter of credit was enforceable by the government. If the government had presented a proper draft drawn under the letter of credit upon EES Inc.'s default, MBank could not have legally refused to honor it.

## II

■ The final issue which must be addressed is whether the Contracting Officer's decision that the letter of credit was not a valid "bid guarantee" was arbitrary and capricious.

The fact that this Court would find the letter valid in a lawsuit between the Corps and MBank is a fact or to be considered in this inquiry, but it does not answer the question. The bid solicitation required each bidder to "furnish a bid guarantee in the proper form and amount." Soliciation Provisions at SP–8. The purpose of the bid guarantee was to ensure that the successful bidder executed all necessary contractual documents and timely furnished the bonds required by the solicitation. The Contracting Officer had a duty to make sure that the bid guarantee furnished "full and complete protection" to the Corps in the event of such default. It is against this

background that his actions must be evaluated.

The Contracting Officer made his decision on the advice of the counsel who had recommended that the bid be rejected because the bid guarantee was invalid. Mr. Collins, the Corps' counsel, based his recommendation on a Comptroller General decision, *In re S & S Contracting, supra.* That decision, while based on dubious analysis, addresses the precise issue in question and holds that such a letter of credit is not a valid bid guarantee. While Comptroller decisions are not absolutely binding on the Corps, they are rightfully given great weight by the agency. The fact that the Contracting Officer relied on the Corps' counsel's recommendation and that the counsel's recommendation was based on a Comptroller decision directly on point weighs in favor of finding the decision rational and not arbitrary and capricious.

This is not to say that a Contracting Officer can blindly follow counsel's advice (and Comptroller's decisions) in awarding contracts when the advice is clearly incorrect and contrary to establish case law. However, that is not what happened here. As mentioned, neither the Court nor the parties could find any case law which directly answered the question of whether the letter of credit was enforceable by the government. The above analysis demonstrates that the answer was neither obvious nor easy to arrive at. It is not inconceivable that another court may have found the letter to be unenforceable by the government. A Contracting Officer is not required to "buy a lawsuit" by accepting a bid guarantee that may or may not be enforceable. In fact, the contrary is true; he is to ensure that the bid guarantee fully and completely protects the government in the event of default by the successful bidder. Given this, the Court finds that the Contracting Officer's decision that the bid of EES Inc. was nonresponsive because of its bid guarantee was not arbitrary and capricious.

It is, therefore, ordered that Judgment be entered for the Defendants, with costs to the Plaintiff.

SO ORDERED.

<u>APPENDIX A</u>

(MBank Dallas Letterhead)

IRREVOCABLE STANDBY LETTER OF CREDIT NO. 2596968–215     DATE 9/10/86     LR

<u>BENEFICIARY</u>

U.S. Army Engineer Dist.
757 Federal Bldg.
601 E. 12th St.
Kansas City, MO   64106–2896

<u>AMOUNT</u> $1,600,000.00
(One Million Six Hundred Thousand and 00/100 U.S. Dollars)

<u>APPLICANT</u>

Environmental Systems Company
1015 Louisiana
Little Rock, Arkansas   72202

<u>EXPIRY</u>
December 9, 1986
At our counters

Gentlemen:

We hereby issue our Clean Irrevocable Standby Letter of Credit in your favor available by your draft on us at sight bearing the clause "Drawn under MBank—Dallas, N.A. Letter of Credit No. 2596968–215 dated September 10, 1986," accompanied by this original Letter of Credit.

Special Instructions: Negotiations restricted to MBank—Dallas, N.A. PARTIAL DRAWINGS ARE NOT PERMITTED.

This Letter of Credit is for Fed. #DACW 41–86–B–0121.

We hereby agree with you that the draft drawn under and in compliance with the terms of this credit shall be duly honored on due presentation to us.

Except as otherwise expressly stated herein, this Credit is subject to the Uniform Customs and Practices for Documentary Credits (1983 Revision) International Chamber of Commerce, Publication 400.*

Very truly yours,

/s/ _____
Authorized Signature(s)
MBank—DALLAS, N.A.

---

\* The Court examined the Uniform Customs and Practices for Documentary Credits and found that none of its provisions resolved the controversy in this case.